IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BROCK INDUSTRIAL SERVICES, LLC, )
)
Plaintiff, )
)
vs. ) Case No. 16-CV-780-NJR-DGW
)
LABORERS' INTERNATIONAL )
UNION OF NORTH AMERICA, )
CONSTRUCTION & GENERAL )
LABORERS LOCAL #100, )
)
Defendant. )

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Two motions are pending before the Court: a Motion for Reconsideration (Doc. 43) filed by Brock Industrial Services, LLC ("Brock") and a Motion for Summary Judgment (Doc. 42) filed by Laborers International Union of North America, Construction & General Laborers Local #100 ("Laborers"). For the reasons set forth below, the Court denies Brock's Motion for Reconsideration and grants Laborers' Motion for Summary Judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of a contract dispute between Brock and Laborers. Specifically, Brock seeks to have the April 14, 2016 decision by the National Maintenance Agreement Policy Committee, Inc. ("NMAPC") Grievance Review Subcommittee ("GRS") vacated by this Court.

The facts leading to the GRS decision are largely uncontested. Brock and Laborers agreed to the National Maintenance Agreement collective bargaining agreement (NMA) with an effective date of January 7, 2016. (Doc. 1-3, p. 11). The NMA provides in pertinent part that "[e]xcept for jurisdictional and general wage rates disputes…all disputes and grievances arising out of work performed under this Agreement…shall be resolved…"through the procedure outlined in Article VI— Grievances of the NMA (Article VI). (Doc. 1-3, p. 15). Article VI requires the parties to submit any unresolved grievances to the NMACP for arbitration. (Doc. 1-3, p. 15). For work jurisdictional disputes, a different procedure under the NMA applies. (Doc. 1-3, p. 12-13, specifically, Article I, Sections 6-12). A work jurisdiction dispute is "a dispute between two or more groups of employees over which are entitled to do certain work for an employer." *Hutter Const. Co. v. Int'l Union of Operating Eng'rs, Local 139, AFL-CIO*, 862 F.2d 641, 644 (7th Cir. 1988).

Brock employed Laborers to construct scaffolding at the Afton Chemical Plant. (Doc. 1-3, p. 56). However, on January 8, 2016, Brock notified Laborers that they were laid off and that scaffolding work at the Afton Chemical Plant would be assigned to the International Brotherhood of Carpenters ("Carpenters"). (Doc. 18-1; Doc. 1-3, p. 56). Laborers notified the NMAPC via letter on January 11, 2016, that Brock violated the NMA when it wrongfully terminated Laborers and subsequently awarded the scaffolding work to Carpenters. (Doc. 1-3, pp. 34-35). On January 21, 2016, Laborers also notified Carpenters that there was a work jurisdiction dispute between their respective organizations over the scaffolding work. (Doc. 1-3, p. 37).

In accordance with Article VI, Laborers filed a grievance with the NMAPC alleging that a wrongful termination of Laborers' members had occurred on January 8, 2016, and seeking the reinstatement of those members. (Doc. 1-3, p. 39). Brock responded to the grievance, asserting that the dispute relating to the January 8, 2016 layoff was a work jurisdiction dispute and was therefore beyond the scope of the NMAPC's arbitration authority. (Doc. 1-3, pp. 54-56). Brock further requested that the grievance be dismissed and denied. (Doc. 1-3, p. 56).

The GRS denied Brock's request to dismiss, and on April 14, 2016, sustained the grievance finding a violation of Article I, Section 5, of the NMA. (Doc. 1-3, p. 3). Article I, Section 5, states that "[d]uring the existence of the Agreement, there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. Work will continue as originally assigned, pending resolution of the dispute." (Doc. 1-3, p. 12). The GRS concluded that Brock violated that section when it made a "change of assignment." (Doc. 1-3, p. 3).

On July 12, 2016, Brock filed suit against Laborers pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking to have the GRS decision vacated on the basis that it was outside the scope of the GRS's arbitration authority. (Doc. 1, p. 2). Subsequently, the parties filed four motions with the Court, one by Brock and three by Laborers, all of which were interrelated. Specifically, on August 2, 2016, Laborers filed a Motion to Dismiss (Doc. 15), seeking dismissal of the Complaint for failure to state a claim. On September 19, 2016, Brock filed a Motion to Vacate (Doc. 18), seeking to have the GRS arbitration decision vacated. On September 30, 2016,

Laborers filed a Motion to Dismiss the Motion to Vacate (Doc. 26), seeking to have Brock's Motion to Vacate dismissed on timeliness grounds, as well as being redundant with Brock's Complaint. Lastly, on November 28, 2016, Laborers filed a Motion to Enforce (Doc. 30), seeking to have the GRS arbitration decision enforced.

On March 27, 2017, the Court denied all four motions. (Doc. 37). The claims presented by the parties appeared to involve a disagreement over whether Brock's January 8, 2016 assignment of scaffolding work to Carpenters involved solely a work jurisdiction dispute, or alternatively, two separate disputes—one a work jurisdiction dispute and the other for wrongful termination. (Doc. 37, p. 7). The Court noted that if the grievance involved solely a work jurisdiction dispute, then it was improper for the GRS to arbitrate the dispute under Article VI of the NMA. (Doc. 37, p. 14). Conversely, if the grievance involved both wrongful termination and jurisdictional claims, then the GRS had authority to resolve the dispute under Article VI.[1]

The Court found it was unable to make a determination regarding which arbitration process applied, however, due to the existence of disputed issues of material fact.[2] (Doc. 37, p. 16). Specifically, the Court identified a factual disagreement between the parties as to whether Laborers were ever assigned the scaffolding work. (Doc. 37,

---

[1] As a point of clarification, the Court recognizes that the GRS would only have authority to arbitrate the wrongful termination grievance under Article VI. The separate jurisdictional grievance would need to be arbitrated pursuant to the procedure contained in Article I, Sections 6-12. (Doc. 1-3, pp. 12-13).

[2] The Court noted that although neither party explicitly moved for summary judgment in order to vacate or enforce the GRS decision, application of the standard for summary judgment was appropriate. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir. 1980)(applying summary judgment standard because district court's order to arbitrate is summary disposition of whether there had been a meeting of the minds on agreement to arbitrate); *In re Frascella Enterprises, Inc.*, 349 B.R. 421, 426-27 (Bankr. E.D. Pa. 2006) (motion to enforce an arbitration agreement reviewed under standard for summary judgment).

p. 16). If assigned to perform the scaffolding and then terminated from that assignment, the Court reasoned Laborers would have both a wrongful termination and a separate jurisdictional dispute. (Doc. 37, p. 16). If Laborers were not assigned the scaffolding work in the first place, however, then Brock's choice to assign the work to Carpenters would only constitute a jurisdictional dispute outside the authority of the GRS to arbitrate. (Doc. 37, p. 16). As a result of the apparent disputed facts, the Court denied Brock's Motion to Vacate and Laborers' Motion to Enforce. (Doc. 37, p. 17).[3]

On April 24, 2017, Brock filed a Motion for Reconsideration asking the Court to revisit its denial of Brock's Motion to Vacate the arbitration decision. (Doc. 43, p. 1). On the same day, Laborers filed a Motion for Summary Judgment. (Doc. 42).

## ANALYSIS

### I. Motion for Reconsideration

Federal Rule of Civil Procedure 59(e) allows a court to alter or amend a judgment in order to correct manifest errors of law or fact, to present newly discovered evidence, or where there has been an intervening and substantial change in the controlling law since the submission of the issues to the district court. Fed. R. Civ. P. 59(e); *See also Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). Motions to reconsider under Rule 59(e) should only be granted in rare

---

[3] The two additional motions filed by the parties were denied on separate grounds. The Motion to Dismiss filed by Laborers was denied based on the Court's finding that Brock had stated a plausible claim that the GRS decisions should be vacated because it was outside the essence of the parties' agreement. (Doc. 37, pp. 11, 17). The Motion Dismiss the Motion to Vacate (Doc. 26) filed by Laborers was denied as both undeveloped and inappropriate under Federal Rule of Civil Procedure 12(f)(2). (Doc. 37, p. 5). Laborers has not requested reconsideration of the denial of these two motions.

circumstances. *Id.* The decision whether to grant a Rule 59(e) Motion to Reconsider lies in the sound discretion of the Court. *Matter of Prince,* 85 F.3d 314, 324 (7th Cir. 1996).

A manifest error of law includes the "disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metropolitan Life Ins.,* 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation marks omitted). A manifest error is not demonstrated by the disappointment of the losing party. *Id.*

Brock alleges the Court committed a manifest error of law in three ways: (1) by failing to follow *William Charles Construction Co., LLC v. Teamsters Local Union,* 827 F.3d 672 (7th Cir. 2016), when denying the Motion to Vacate; (2) by mischaracterizing the dispute as involving either a lockout or wrongful termination; and (3) by coming to the wrong conclusion because, even if a termination or lockout occurred, a separate and distinct contractual procedure for addressing lockouts existed in the contract, which should have led the Court to the find the GRS did not have jurisdiction to arbitrate. (Doc. 43, p.2).

**A. *William Charles v. Teamsters Local Union.***

Brock's first argument for reconsideration is that the Court erred by failing to "address or apply the principal and controlling legal authority governing this matter," which Brock identifies as being *William Charles v. Teamsters Local Union*, 827 F.3d 672 (7th Cir. 2016). (Doc. 43, p. 4). Failure to recognize controlling precedent qualifies as a manifest error of law that is properly addressed through a Rule 59 motion for reconsideration. *Oto,* 24 F.3d at 606. In order to assess the applicability of *William*

*Charles,* the Court first reviews the United States Supreme Court and Seventh Circuit precedent related to enforcement of arbitration awards.

The principles for reviewing arbitration awards were first set out by the United States Supreme Court in a trilogy of cases commonly referred to as the *Steelworkers Trilogy*.[4] In those cases, the Court held the question of whether the parties agreed to arbitrate a particular grievance qualifies as an issue for judicial review. *Warrior & Gulf*, 363 U.S. 574, 582-83 (1960). The scope of that judicial review is extremely narrow, however. Courts are limited to determining whether the terms of the contract indicate the parties agreed to arbitrate. *Id.* They are not empowered to weigh the merits of the underlying claim. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986). The Supreme Court has been clear that where the contract contains an arbitration clause, there is a presumption of arbitrability, and any doubts should be resolved in favor of coverage. *Id.* at 650. This presumption of arbitrability may only be overcome by 'forceful evidence' of intent to exclude the claim." *Oil, Chemical and Atomic Workers Int'l Union v. Amoco Oil Co.*, 883 F.2d 581, 587 (7th Cir. 1989) (quoting *Steelworkers v. Warrior & Gulf,* 363 U.S. at 585).

Once a court determines a grievance was arbitrable, its analysis ends. *See United Steel Workers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). Interpretation of the terms of the collective bargaining agreement is an issue solely for the arbitrator. *Id.* As long as the arbitrator's decision concerns construction of the

---

[4] The *Steelworkers' Trilogy* includes: *Steelworkers v. American Mfg. Co.,* 363 U.S. 564 (1960); *Steelworkers v. Warrior & Gulf,* 363 U.S. 574 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960).

Page **7** of **20**

contract, the courts have no authority to overrule the arbitrator simply because their interpretation is different. *Id.*

Where a party raises multiple claims, those grievances that are severable from the jurisdictional issues are individually arbitrable. *Hutter Constr. Co. v. Int'l Union of Operating Eng'rs, Local 139*, 862 F.2d 641, 644 (7th Cir. 1988). The Seventh Circuit in *Hutter Constr. Co. v. Int'l Union of Operating Eng'rs, Local 139* found that the union had raised distinct contractual and jurisdictional claims, each of which was arbitrable through different procedures. *See Hutter,* 862 F.2d at 644. There, the state of Wisconsin awarded a general contractor, Hutter, the contract to build a medium security prison. *Id.* at 642. Hutter was party to a collective bargaining agreement that required it to assign all forklift work to Operators, a union representing mason-tending forklift workers. *Id.* The agreement also stipulated that any sub-contracting of work could only be made to signatories of the agreement. *Id.* Despite that provision, Hutter sub-contracted the masonry work to Bill Dentinger Inc. (BDI), who was not a signatory. *Id.* BDI then awarded the forklift work to a different union (Laborers), instead of Operators. *Id.* As a result, Operators filed a grievance against Hutter, claiming Hutter violated the sub-contracting provision of the collective bargaining agreement.[5] *Id.* Hutter objected to the arbitration procedure used, claiming the grievance was jurisdictional in nature and therefore the arbitrator lacked jurisdiction. *Id.* at 643. The Seventh Circuit found that because Hutter could have violated the sub-contracting

---

[5] Subsequently, both Hutter and BDI filed separate claims with the NLRB against Laborers, claiming unfair labor practices. *Hutter,* 862 F.2d at 643. The NLRB dismissed the unfair labor practices claims against Laborers based on its finding that the Laborers had the superior claim to the forklift work. *Id.*

Page **8** of **20**

provision of the agreement, regardless of a finding about which union should have been was awarded the work, the sub-contracting claim raised a separate grievance distinct from the jurisdictional question. *See Id.* at 644. As a result, the Court upheld the arbitrator's finding that the dispute between Hutter and Operators was non-jurisdictional in nature, and therefore separately arbitrable. *Id.* at 646.

In this case, Laborers' grievance for improper termination was separately arbitrable from any claims regarding jurisdiction, and therefore it was properly decided by the GRS. In *Hutter*, the sub-contracting grievance could be (and was) resolved regardless of which union was ultimately awarded the work. Similarly, here, Laborers' improper termination grievance could be resolved regardless of whether Laborers were ultimately awarded the work. Article I, Section 5 of the agreement states "there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. Work will continue as originally assigned, pending resolution of the dispute." (Doc. 1-3, p. 12). The first sentence of the provision appears designed to prevent the parties from participating in any disruptive behavior while a jurisdictional dispute is being resolved. It is therefore possible that an arbitrator could find an employer improperly locked out union employees, or that a union improperly picketed an employer, without having to determine who was entitled to the underlying disputed work assignment. The mere fact that the prohibited behavior is in response to

disagreement over assignment of work does not make the prohibited behavior itself a jurisdictional issue.[6]

Further, the second sentence of Article I, Section 5 requires work to continue as originally assigned, pending resolution of a jurisdictional dispute." (Doc. 1-3, p. 12). In other words, the employer is required to maintain the status quo. It is therefore possible that an arbitrator could find an employer improperly discontinued the original work assignment, without having to assess who was ultimately entitled to the final work assignment. Because the arbitrator could find for or against Laborers under Article I, Section 5—regardless of whether they were ultimately successful on a jurisdictional claim—Laborers' grievance for improper termination was separately arbitrable by the GRS.

Brock disagrees, essentially arguing that the termination grievance filed by Laborers did not have a separate contractual basis and therefore was not severable from the jurisdictional issue. (Doc. 43, pp. 13-15). To support this contention, Brock relies on the Seventh Circuit's decision in *William Charles v. Teamsters Local Union* (Doc. 43, p. 10). In *William Charles*, a dispute arose between the Teamsters and Engineers unions over which entity was entitled to be assigned work under a labor agreement. *William Charles*, 827 F.3d at 675. William Charles, the employer, had assigned the work to the Engineers union. *Id.* The Teamsters union objected and brought a jurisdictional complaint against

---

[6] Brock makes an argument that *Hutter* is not applicable because, among other reasons, the claim by Laborers did not involve a sub-contracting claim. (Dec. 43, p. 13). The Court does not read *Hutter* as being limited to those cases involving sub-contracting clauses. Rather, the Court understands *Hutter* to more broadly hold that where a contractual basis exists, independent of a jurisdictional grievance, the two issues are separately and individually arbitrable.

the Engineers under the Project Labor Agreement (Agreement). *Id.* The grievance was arbitrated under the Agreement's jurisdictional dispute process, resulting in a finding for the Teamsters. *Id.* However, the arbitration decision did not award the Teamsters any back pay or benefits. *Id.* at 676. Five days later, the Teamsters filed a second grievance, this time against the employer, William Charles. *Id*. William Charles objected to the arbitration process, claiming the arbitrator did not have authority to hear the issue because the second grievance was purely jurisdictional in nature. *Id.* The Seventh Circuit agreed. *Id.* at 680-81.

Two reasons support the Court's determination that the second grievance was jurisdictional. First, the *sole rationale* that was the basis for the second grievance was the decision in the earlier arbitration. *William Charles*, 827 F.3d at 676. Presumably, because the earlier arbitration was purely jurisdictional, the second grievance's complete reliance on that determination meant the claims could also only be jurisdictional. Second, the Seventh Circuit looked to the contractual language that was the basis for the Teamsters' claim. *Id.* at 680. The relevant provision stated only that "[t]he operation of all equipment shall be assigned to the proper craft jurisdiction." *Id.* The contract provision at issue had one goal—to ensure the correct union (craft jurisdiction) received the contract. The Court reasoned that because the language of the contract relied on by the Teamsters explicitly concerned jurisdiction, the claim was jurisdictional in nature. *Id.*

Given the significantly different factual circumstances, *William Charles* is not applicable in this case. In *William Charles,* the union's grievance against the employer

was based solely on a prior jurisdictional decision in its favor—as a result there could only be a jurisdictional basis for the second claim. Conversely, here there is no prior decision at all. Despite Brock's claims to the contrary, the mere fact that Laborers believed they had a separate jurisdictional grievance against Carpenters does not make their claim against Brock automatically jurisdictional in nature.

Further, the contractual language here is clearly distinguishable from the language contained in *William Charles*. In *William Charles* the contract stated that "[t]he operation of all equipment shall be assigned to the proper craft jurisdiction." *William Charles*, 827 F.3d at 680. This language created only one possible basis for a grievance—jurisdiction. Conversely, the language here creates several possible bases for a grievance completely unrelated to which union properly has jurisdiction to do the work. Specifically, the language of Article I, Section 5, states that "[d]uring the existence of the Agreement, there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. Work will continue as originally assigned, pending resolution of the dispute." (Doc. 1-3, p. 12). Brock reads the "any jurisdictional dispute" language of Section 5 to limit the entire Section to jurisdictional issues.[7] (Doc. 1-3, p. 13). As discussed above, however, the plain meaning of the first sentence creates a prohibition on certain types of behaviors during a jurisdictional dispute. The second sentence creates an obligation on the part of the employer to maintain the employment

---

[7] In order to read the contract provision to create only a jurisdictional issue, the Court would have to interpret the Seventh Circuit's use of the term "explicitly" in *William Charles* to mean that any overt reference to "jurisdiction" in a contract provision would render that entire provision solely jurisdictional in nature regardless of the intent of the parties. The Court declines to adopt such an interpretation. Giving *William Charles* such a reading would be inconsistent with the holding in *Hutter* that recognizes parties may raise distinct jurisdictional and non-jurisdictional claims. *Hutter*, 862 F.2d at 644.

status quo. Whether one of the parties participated in prohibited activity, and whether the employer maintained the employment status quo, could both be determined regardless of the outcome on the jurisdictional issue.

Article I, Section 5 creates several cognizable claims unrelated to jurisdiction, thus the language cannot be said to be either explicitly or exclusively concerned with jurisdiction, and therefore *William Charles* is not controlling.[8] As a result, the Court did not commit a manifest error of law, and Brock's Motion for Reconsideration is denied on those grounds.

### B. Characterization of the Dispute Between the Parties as Including a "Lockout" or Wrongful Termination.

Brock's second argument for reconsideration is that the Court erred by characterizing the dispute between the parties as involving a "wrongful termination" or "lockout." (Doc. 43, p. 2). Brock is correct that the Court framed Laborers' argument as being a "two-part wrongful termination (or lockout)" claim. (Doc. 37, p. 13). In retrospect, the language of the Court's order could have been clearer. But the purpose of the Court's reference was not to identify a particular type of legal claim, but rather to illustrate that Laborers had two distinct grievances—one against Brock related to the termination of Laborers and their exclusion from the work site, and the other a

---

[8] At best, Brock's reading of Article I, Section 5, provide a second alternative interpretation of the parties' intent. The Supreme Court has been clear, however, that where the contract contains an arbitration clause, there is a presumption of arbitrability, and any doubts should be resolved in favor of coverage. *AT&T Technologies*, 475 U.S. at 650. Further, this presumption of arbitrability may only be overcome by 'forceful evidence' of intent to exclude the claim." *Amoco Oil*, 883 F.2d at 587 (quoting *Steelworkers v. Warrior & Gulf*, 363 U.S. at 585). Here, the Court's reading of the language of Section 5 as creating a separate non-jurisdictional grievance resolves the conflict in favor or arbitrability. The alternative reading of the language urged by Brock also cannot be said to create "forceful evidence" of the intent to limit Article I, Section 5, to jurisdictional grievances. Therefore, the Court declines to interpret the language as narrowly as Brock demands.

jurisdictional grievance against Carpenters. The substance of the legal claim is not relevant, except in so far as it helps the Court determine whether the issues were arbitrable by the GRS. *AT&T Technologies*, 475 US at 649-50. As discussed above, if Laborers raised a grievance distinct from the jurisdictional issue, that non-jurisdictional claim was arbitrable under Article VI. Because the framing of Laborers' claim as a "wrongful termination (or lockout)" did not impact the underlying analysis of arbitrability, there is no manifest error.

Brock further argues that the Court erred because there was "no lockout as a matter of law,[9] and any finding to the contrary [was] in error." (Doc. 43, p. 2). The Court notes, however, that its Order did not make any finding as to whether or not a lockout occurred in this case (Doc. 37, pp. 1-17), nor was it authorized to do so, *AT&T Technologies*, 475 U.S. at 649-50 (courts are not empowered to weigh the merits of the underlying claim).

The Court's Order solely addressed the question of whether the GRS had authority to arbitrate the dispute and thus characterization of Laborers' position as involving a "termination (or lockout)" for purposes of determining that authority was not a manifest error of law.

---

[9] Brock admits that there is no uniform definition of a "lockout." (Doc. 43, p. 14). But Brock then goes to great pains to develop a definition by cobbling together language form Roberts Industrial Dictionary (3rd Ed.), the 1951 decision of the N.L.R.B. in *Betts Cadillac Olds, Inc.*, 96 N.L.R.B. 268, 282-83 (1951), and the Eighth Circuit decision *Brady v. National Football League*, 644 F.3d 661, 674 (8th Cir. 2011). (Doc. 43, pp. 17-18). The Court declines to apply Brock's creative elements test, as the Court does not need to determine whether a lockout in fact occurred.

**C. Had Laborers' Raised a "Lockout" Claim, the GRS would have had Jurisdiction to Arbitrate.**

Brock's final argument is that even if a lockout did occur, the GRS did not have arbitration authority because lockouts were intended by the parties to be arbitrated through a different process. (Doc. 43, p. 2). As stated above, the Court did not find that a lockout occurred, and the GRS decision was based on an improper "change of assignment," not a lockout. (Doc. 1-3, p. 3).

But even if the claim involved a "lockout," the GRS had authority to arbitrate the grievance. As stated in the March 27 Order (Doc. 37, p. 19), the Court views the procedures listed in the NMA as creating two different arbitration agreements—the procedure for jurisdictional disputes under Article I, Sections 6-12, and the procedure for all other disputes and grievances under Article VI. (Doc. 37, p. 8). Brock now claims that a third mandatory arbitration clause exists under Article XXII. (Doc. 43, p. 16). Article XXII, Section 8 states "a party or the NMAPC *may* institute the following procedure, in lieu of, or in addition to, any other action at law or equity." (Doc. 1-3, p. 23) (emphasis added). The Court reads this language as permissive, not mandatory. If the grievance had related to a lockout, and one of the parties or the NMAPC had desired, they could have availed themselves of a different arbitration procedure. Nothing in this language requires the parties to do so, however, nor does it strip the GRS of its authority to hear a grievance even if it is premised on the theory of a "lockout."

The language of Article VI further supports the Court's finding that Article XXII does not create a separate mandatory arbitration process for lockout claims. Article VI provides the primary method for resolving disputes under the NMA. (Doc. 1-3, p. 15). Article VI only recognizes exceptions to its terms for claims involving jurisdiction or general wage rates. (Doc. 1-3, p. 15). The fact that Article VI does not list the lockout hearing procedures in Article XXII as a mandatory exception to its arbitration terms indicates the parties intended that section to be optional.

The broad language of Article VI, combined with the plain language of Article XXII, Section 8, led to the conclusion that even if a lockout was involved in this case, the GRS still retained jurisdiction to decide that claim under the provisions of Article VI. As a result, the Court did not commit a manifest error of law because, even if a lockout claim was raised, the GRS had authority to arbitrate that dispute.

For these reasons, Brock's Motion for Reconsideration (Doc. 43) is denied.

## II. Motion for Summary Judgment (Doc. 42)

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). The Court found in its March 27 Order that material issues of fact existed as to whether Laborers were assigned the scaffolding work prior to Brock's award of that work to Carpenters. (Doc. 37, pp. 14, 16). As a result, the Court denied both Brock's Motion to Vacate and Laborers' Motion to Enforce. (Doc. 37, p.17). In the Motion for Summary Judgment, however, Laborers now allege there is no material dispute of fact because

Brock has admitted to laying off Laborers. (Doc. 42, pp. 1- 2). Supporting this contention, Laborers point to Exhibit H in the original Complaint, containing a letter from the Assistant General Counsel for Brock to the NMAPC. (Doc. 42, p. 2). That letter contains three statements directly supporting Laborers' contention that they were terminated. First, the letter contains the statement that "Brock admits that laborers attended a meeting on January 8, 2016 and were informed that they would be laid off on that date." (Doc. 1-3, p. 56). The letter further includes an admission that on January 18, 2016, Brock informed Laborers' Business Manager by phone that "laborers were laid off." (Doc. 1-3, p. 56). Finally, in the letter Brock argues that it "exercised its legitimate management right to layoff Laborers." (Doc. 1-3, p. 55). Laborers argues that the language of Exhibit H shows that no material issue of fact exists as to whether Laborers were employed and subsequently laid off at the January 8, 2016 meeting. (Doc. 42-1, p. 4).

Brock agrees. In its response to the Motion for Summary Judgment, Brock admits that there are "likely no genuine issues of material fact excluding the issue of damages."(Doc. 47, p. 1). Further, Brock admits that Exhibit H to the Complaint contains the statements referenced above regarding layoff of the Laborers. (Doc. 47, p. 2). As a result, the Court accepts as uncontested fact that Laborers were employed by Brock to perform scaffolding work prior to January 8, 2016, when they were laid off by Brock. Since no material issues of fact exist, the Court turns to whether Laborers are entitled to judgment as a matter of law.

The question for the Court is whether, as a matter of law, the arbitrator's award is enforceable. An arbitrator's award must stand unless a reviewing court finds the parties did not agree to arbitrate the subject of the claim, *AT&T Technologies*, 475 U.S. at 648, or the award does not to draw its essence from the collective bargaining agreement, *Alberici-Eby*, 992 F.2d 727, 733 (7th Cir. 1993). So long as the arbitrator's interpretation can in some rational manner be derived from the agreement, the decision will stand. *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local 781*, 629 F.2d 1204, 1215 (7th Cir. 1980).

Here, the parties agreed to arbitrate this dispute under Article VI of the NMA. Article VI provides the general process for arbitration under the NMA. (Doc. 1-3, p. 15). The only exceptions to that process exist for "jurisdictional disputes and those involving general wage rates." (Doc. 1-3, p. 15). As fully discussed above in the Court's analysis of the Motion for Reconsideration, the terms of Article I, Section 5, are such that an arbitrator could sustain a grievance regarding the behavior of the parties, without coming to any determination about which union was ultimately entitled to the underlying work. As a result, claims under Article I, Section 5, do not automatically relate to jurisdiction. Because the Court finds the improper termination claim here does not relate to either jurisdiction or general wage rates, the GRS had authority to resolve the grievance under Article VI of the NMA.

The award by the arbitrator also is enforceable because it drew its essence from the collective bargaining agreement. As long as the arbitrator's decision concerns construction of the contract, courts may not overrule the arbitrator just because their

interpretation is different. *United Steelworkers*, 363 U.S. at 599. The reviewing court must not replace the arbitrator's interpretation with its own even if the arbitrator's interpretation is plainly wrong. *Alberici*, 992 F.2d at 733.

Here, the GRS sustained the grievance based on its finding that Brock violated Article I, Section 5, because of a change of assignment. (Doc. 1-3, p. 3). Although Section 5 does not specifically contain the language "change of assignment," the Seventh Circuit has held that arbitrators are not required to read contract provisions literally. *Ethyl Corp. v. United Steelworkers of America, Local No. 7441*, 768 F.2d 180, 186 (7th Cir. 1985). Rather, because contracts have both express and implied terms, the arbitrator has authority to interpret the contract as including implied terms so long as those terms can be rationally derived from some plausible theory of the general framework or intent of the agreement. *Id.* at 186.

Here, the GRS decision finding a violation of Article I, Section 5, due to a "change of assignment" is rationally derived from a plausible theory of the framework or intent of the agreement. Section 5 contains a listing of different behaviors parties are expected to refrain from during a jurisdictional dispute. (Doc. 1-3, p. 12). The arbitrator was not required to read this list literally or exhaustively, but rather could reasonably interpret the list as representational of the types of behaviors that are proscribed by the NMA. Exclusion of employees from the work site is clearly intended by the parties to be prohibited behavior—as evidenced by the "lockout" language listed in Article I, Section 5. The arbitrator could reasonably determine that a "change of assignment" that similarly excluded Laborers from the work site was an implied term of the agreement.

Therefore, the GRS's interpretation of Article I, Section 5, to apply to a "change of assignment" was rationally derived from a plausible theory of the framework or intent of the agreement.

Because the parties agreed to arbitrate the dispute under the NMA, and the arbitrator's decision drew its essence from the agreement, the award is enforceable as a matter of law. Therefore, the Court grants Laborers' Motion for Summary Judgment.

## CONCLUSION

For the reasons set forth above, the Motion for Reconsideration filed by Brock (Doc. 43) is **DENIED.** The Motion for Summary Judgment filed by Laborers (Doc. 42) is **GRANTED;** the Court finds the April 14, 2016 decision by the GRS (Doc. 1-3, pp. 2-3) enforceable.

The Clerk is **DIRECTED** to enter judgment in favor of Defendant Laborers International Union and against Plaintiff Brock Industries, in accordance with this Memorandum and Order.

**IT IS SO ORDERED.**

DATED: July 5, 2017

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**